IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| **FIRST AMERICAN TITLE INSURANCE COMPANY,**<br><br>Plaintiff,<br><br>vs.<br><br>**NATIONAL TITLE AGENCY, LLC, WILLIAM D. ROWLEY, NATIONAL TITLE AGENCY OF UTAH, INC., SPENCER ROWLEY,**<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:13CV1055DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Plaintiff First American Title Company's Motion for Partial Summary Judgment [Docket No. 93], and Defendants National Title Agency of Utah, William D. Rowley, and Sterling Spencer Rowley's Motion for Partial Summary Judgment [Docket No. 96]. On April 27, 2017, the court held a hearing on the motions. At the hearing, Plaintiff First American was represented by Richard L. Cobb and Defendants were represented by Sean A. Monson. The court took the motions under advisement. The court has carefully considered the materials submitted by the parties and the facts and law relevant to the motions. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

National Title Agency was a licensed escrow and title agent that closed real estate transactions in Utah. William Rowley formed National Title in 2006. National Title and First

American entered an Agency Agreement on or about March 31, 2009. The Agency Agreement provided that National Title was to deposit all funds and monies it received in trust for others in a separate escrow account. The Agency Agreement also provided that National Title "and all of [National Title]'s principals (in their individual capacity) shall be liable for all trust funds collected as First American's agent." The following paragraph also stated that "[National Title] shall be liable to First American for any shortage in [National Title]'s trust fund account(s). First American shall have a lien on all real or personal property of [National Title], which shall serve as security for the repayment of any shortage in said account(s). Upon receiving a demand by First American, [National Title] shall immediately produce and transfer the shortage to First American."

William Rowley executed the Agency Agreement on behalf of National Title as National Title's President and also executed a personal guarantee to induce First American to enter into the Agency Agreement with National Title. National Title created an escrow trust account at JP Morgan Chase Bank ("Chase") on or about February 4, 2008. The trust account contained escrow deposits from customers of National Title and did not contain money belonging to National Title.

On April 6, 2010, a Utah state court entered a Default Judgment against National Title in *Bell, et al. v. Hemsley, et al.,* Case No. 080902845, Third District Court, Salt Lake County, Utah, for failure to appear at a court status conference. The Judgment states that nonappearance at the status conference would result in default judgment. Because National Title did not appear, the court entered judgment against National Title in the amount of $95,000. The judgment in the *Bell* matter was satisfied through a writ of garnishment served on Chase. After being served with an order to show cause relating to its failure to respond to the Writ of Garnishment, Chase

released $89,783.84, to satisfy the judgment.

On May 7, 2010, a Utah state court entered a Default Judgment against National Title in *Hill, et al. v. Tibbits, et al.*, Case No. 080921870, Third District Court, Salt Lake County, Utah, for failure to appear and answer the Complaint. The judgment entered in the *Hill* case was $387,510.72. Plaintiffs in the *Hill* matter sought a writ of garnishment from the state court, which was granted and served on Chase. Chase completed the Response to Interrogatories accompanying the Writ of Garnishment and removed the funds pursuant to the garnishment on September 20, 2010.

In October 2013, William Rowley, the President and sole owner of National Title, learned that the Chase trust account was short. That same day, Rowley contacted First American to let them know of the shortfall. Rowley also contacted his outside bookkeeping service, Horizon West, and talked to its owner Ken Judd. Judd looked into the issue and told Rowley that the trust account was short of funds because of charges for $89,783.84 and $514,088.32. Judd did not know the cause of those charges.

At Rowley's request, First American sent a forensic accounting team, which determined that the two state court garnishments for National Title's debts had been paid from the trust account and were the cause of the shortfall. First American terminated National Title's agency agreement on November 25, 2013, and initiated this lawsuit for breach of the Agency Agreement and indemnification.

First American has paid out $188,508.40 to customers of National Title who were unable to recover their escrow funds from National Title's trust account. First American is still litigating claims for $177,000 that would constitute additional damages if the claimant prevails. First American is defending the claim because First American contends that the claimant's loss

did not stem from the agency relationship between First American and National Title and did not involve a transaction involving the issuance of title insurance. First American also claims that it should have been paid $775.28 in premiums for title insurance policies issued that National Title failed to remit.

Approximately two years after First American Title sued National Title for indemnification relating to shortfalls in the trust accounts that it was required to pay to third parties, National Title sued Chase for improperly releasing money from the trust accounts in response to the writs for garnishment. This court dismissed National Title's Third-party Complaint against Chase, ruling that National Title needed to bring its claims against Chase in the state court actions that issued the writs of garnishments. National Title pursued those cases in the state courts.

William Rowley managed the day-to-day affairs of National Title. He was responsible for hiring and firing employees, executing contracts on behalf of National Title, and managing National Title's offices and affairs. Spencer Rowley, William's son, worked for National Title. There is a dispute as to whether Spencer Rowley was a manager at National Title.

Approximately two months after William Rowley discovered the shortfall, in December of 2013, National Title stopped providing escrow and title services. Although National Title conducts no business activities, it remains an ongoing Utah Limited Liability Company in good standing. National Title states that since December 2013 it has continued in existence to pay legal fees.

On November 15, 2013, William Rowley created National Title Agency of Utah ("NTAU") as a Limited Liability Company and listed himself as its manager member. That same day, he then converted the LLC into a corporation with himself as Director and President. On

November 21, 2013, he amended the Articles of Incorporation to remove himself as Director and President and to make Sterling Spencer Rowley Vice President and Director.

NTAU began doing business as a title company after entering an underwriting agreement with Chicago Title. NTAU began doing business using the same location, employees, fixtures, and equipment that National Title had used. National Title employees worked through December 31, 2013, as employees of National Title and became employees of NTAU on January 2, 2014, with the same titles. NTAU occupied the same office space as National Title and several months later, NTAU assumed NTA's lease.

On March 27, 2014, but effective January 1, 2014, William Rowley transferred all of National Title's assets to National Title Agency of Utah. The Asset Purchase Agreement states that all of National Title's assets were sold to National Title Agency of Utah for $96,000. First American's expert, however, opined that National Title's assets were actually worth $620,000 at the time of the transfer. The $96,000 National Title Agency of Utah paid to National Title are the funds that National Title has used to pay legal fees. All of the defendants are represented by the same counsel.

William Rowley testified that he transferred the assets because of First American's lawsuit and that he contacted nobody else before selling to his son. Spencer Rowley testified that he was aware of First American's claims when he received the assets. At the time he became Vice President of National Title Agency of Utah ("NTAU"), Spencer was a high school graduate and had taken a few general classes at a community college. He had never run a title company. However, Defendants contend that Spencer Rowley manages the day-to-day affairs of NTAU, is responsible for hiring and firing employees, executing contracts on behalf of NTAU, and managing NTAU's offices and affairs. William Rowley works for NTAU providing

underwriting services and coordinates and works with Chicago Title policies.

William Rowley is now an employee of NTAU and is paid $180,000 per year. At National Title, William Rowley made $150,000 per year. Spencer Rowley had never made more than $100,000 per year at National Title and his salary at NTAU in 2014 was in the range of $90,000-95,000.

Up until December 2013, National Title had its own tax identification number, maintained bank accounts at JP Morgan Chase, Zions Bank, and US Bank, used FAST as its title and escrow software, and did not have an IT service provider. NTAU has its own tax identification number, maintains bank accounts at Wells Fargo Bank, employs RHYNO Live accounting software, uses Title Express as its tile and escrow software, has an IT service provider, and now maintains corporate offices in Midvale, Utah.

## DISCUSSION

### First American's Motion for Partial Summary Judgment

First American moves for summary judgment on its breach of contract cause of action against National Title and William Rowley.

**1. National Title's Breach of the Agency Agreement**

Under the Agency Agreement between First American and National Title, National Title was obligated to keep monies from third parties that was not the property of National Title in a trust account. The Agency Agreement also makes National Title and its principals liable for "all trust funds collected as First American's agent." Furthermore, the Agency Agreement specifically states that National Title is liable for shortfalls in any trust account and that First American is entitled to a lien as security for the repayment of any shortage.

In accordance with the Agency Agreement, National Title opened a trust account at

Chase and deposited funds from third parties into the account. However, subsequently, two writs of garnishment were served on Chase seeking collection of judgments against National Title, and Chase paid the judgment creditors from the trust account. These transfers of funds, paying off National Title's debts, caused a shortage in the trust account.

The Agency Agreement specifically states that National Title is responsible for any shortages in the trust account, but First American has had to pay the losses resulting from the shortage. Accordingly, First American seeks a determination that National Title is in breach of the Agency Agreement.

Defendants argue that there is a genuine issue of material fact as to whether National Title's conduct caused First American's alleged damages or whether they were caused by the intervening conduct of Chase Bank, which released funds from National Title's trust account in violation of Utah law. In Utah, "the non-breaching party" asserting a breach of contract must "show that the breach proximately caused the damages sought." *Christensen & Jensen P.C. v. Barrett & Daines*, 2008 UT 64 ¶ 26, 194 P.3d 931. In this case, Defendants argue that Chase was at fault for how it responded to the writs of garnishment.

However, National Title's complaint with its bank does not overcome National Title's contract with First American. National Title's trust account was garnished--whether because of its own errors or the errors of its agent Chase Bank–and the Agency Agreement makes National Title liable for the resulting shortage. First American has no contract with Chase Bank, and National Title does not articulate any theory under which First American could recover from Chase. National Title's argument is that First American cannot recover from National Title despite the plain language of the Agency Agreement because a party First American cannot recover from is liable. National Title contractually agreed to protect First American from such a

situation.

The facts in the record establish causation for purposes of First American's breach of contract damages against National Title. National Title and First American have a contract that states that National Title is liable to First American for shortfalls in National Title's trust account. National Title does not dispute there was a shortfall in its trust account. National Title does not dispute that First American has had to make payments to third parties as a result of the shortfalls in National Title's trust account. National Title, therefore, has admitted all of the elements of First American's breach of contract claim.

The cases National Title cite do not compel the court to deny summary judgment. *Christensen & Jensen* is a legal malpractice case dealing with the issue of whether an attorney's actions that fall below the standard of care caused damages. 2008 UT 64, 194 P.3d at 931. Legal malpractice cases in Utah are unique in that Utah courts recognize that a cause of action for legal malpractice can be based on three things: negligence, breach of fiduciary duty, and breach of contract. *Id.* ¶ 21. Although Utah courts have recognized that each of the three theories of legal malpractice "deals with a different type of harm, "'the same standard of causation applies whether the alleged wrong is a negligent act, a fiduciary breach, or even a contractual breach.'" *Id.* ¶ 25. The *Christensen & Jensen* court explained that "in a breach of contract action, the non-breaching party is required to show that the breach proximately caused the damages sought. Generally, an award of damages in a breach of contract case attempts to 'place the aggrieved party in the same economic position the party would have been in if the contract was not breached.'" *Id.* ¶ 26. This is in line with other contract cases. A legal malpractice "action for breach of contract . . . is very different from the other two legal malpractice theories . . . . A legal malpractice claim based on contract deals directly with the attorney's breach of a specified term

8

in a contract between the attorney and the client, within the scope of the attorney-client relationship, that causes the client to suffer damages. In other words, '[r]ules of contract, not rules of legal malpractice, govern an action for breach of a promise.'" 2008 UT 64 ¶ 24, 194 P.3d at 938. In addition, the *Christensen & Jensen* court stated that when the facts are not in dispute, proximate causation may be determined as a matter of law. *Id.* ¶ 32.

While the issue may be confusing in the legal malpractice context, it is not confusing in a regular breach of contract case. Causation in this case is simple. National Title promised to be liable for all trust monies and shortfalls in the trust account and breached that promise by failing to pay for those shortfalls. First American had to pay for the shortfalls as a result of National Title's breach. First American is entitled to be put in the place it would have been in if National Title had honored its promises under the Agency Agreement. Chase was not a party to National Title's obligations to First American. Although National Title may have a right of indemnity against Chase if Chase breached its obligations to National Title, Chase's potential indemnity obligation to National Title does not impact First American's rights under the Agency Agreement.

Accordingly, the court grants First American summary judgment on its breach of contract claim against National Title. First American will prove the exact damages resulting from that breach at trail.

**2. William Rowley's Breach of Agency Agreement and Personal Guaranty**

Next, First American seeks summary judgment for breach of the Agency Agreement against William Rowley individually in relation to the trust account shortages and for breach of his Personal Guaranty in relation to failure to remit insurance premiums.

Paragraph 3.e of the Agency Agreement states that National Title and its principals, in

9

their individual capacities, "shall be liable for all trust funds collected as First American's agent, including, but not limited to, Escrow Funds, recording fees (including transfer and mortgage taxes), real estate taxes, First American's share of Premiums related to Policies, and any other monies held by" National Title that are not the exclusive property of National Title. The next paragraph, Paragraph 3.f, states that National Title "shall be liable to First American for any shortage in [National Title]'s trust fund account(s). First American shall have a lien on all real or personal property of [National Title], which shall serve as security for the repayment of any shortage in said account(s)."

The parties dispute how the two paragraphs should be read together. First American argues that William Rowley breached Paragraph 3.e by failing to pay the shortages caused by the garnishment payments and that paragraph makes him individually liable for all funds collected as First American's agent. However, Defendants argue that according to the basic rule of contract interpretation that a specific provision controls over a general one, Paragraph 3.f controls over Paragraph 3.e because Paragraph 3.f specifically refers to only National Title being liable for trust account shortages whereas Paragraph 3.e more generally holds National Title and its principals "liable for all trust funds collected as First American's agent." Accordingly, Defendants contend that whatever obligations Paragraph 3.e is intended to impose on National Title and its principals in their individual capacities, principals are not liable for shortfalls in the trust account because that is specifically dealt with in Paragraph 3.f. Defendants further assert that if Paragraph 3.e controlled liability for trust account shortfalls, it would render Paragraph 3.f wholly superfluous.

But First American argues that another fundamental rule of contract interpretation is to consider "each contract provision in relation to all of the others, with a view toward giving effect

to all and ignoring none." *Terry v. Hinds*, 47 F. Supp. 3d 1265, 1271-72 (D. Utah 2014). First American contends that Paragraph 3.f does not render the language in Paragraph 3.e ambiguous, but merely gives First American a lien on shortfalls in the trust account. Under this reading, the two paragraphs work together and are consistent. To read Paragraph 3.f as negating the liability of the principals leaves the language of 3.e ineffectual because there are no other obligations with respect to the trust monies.

Based on the conflicts these paragraphs present, the finds concludes the Agency Agreement to be ambiguous. The court agrees that it must harmonize these seemingly conflicting provisions but it is unable to do so with the plain language of the agreement. The only apparent way to harmonize the two provisions is to read Paragraph 3.f as a provision intended to provide a lien in favor of First American. However, if both National Title and its principals are liable for shortfalls in the trust account, it is unclear why the agreement would provide for a lien only against National Title and not both National Title and its principals. However, reading Paragraph 3.f to mean that a principal is not liable for trust account shortfalls makes Paragraph 3.e meaningless. Because the plain language of these provisions creates ambiguity, parole evidence is necessary to fully understand the scope of the provisions. At trial, the parties will need to introduce parole evidence regarding these provisions. Accordingly, the court finds it would be inappropriate to enter summary judgment as a matter of law on this issue prior to trial.

Next, First American seeks premium payments from William Rowley under his Personal Guaranty. The Personal Guaranty makes Rowley liable for "the obligations of the Agent under Section 6 of the Agency Agreement to remit the Company's share of the title insurance premiums received." National Title has failed to remit premiums in the amount of $775.28. Defendants,

however, argue that First American is not entitled to the premiums because it failed to identify this unpaid premium in response to document requests.

However, First American properly disclosed its claim for the $775.28 payment in response to Interrogatory No. 7 in discovery. First American provided this information over a year before discovery closed in this case. The documents showing the debt were produced with the responses to the discovery requests at FA00030 to 00035. Admittedly there is an inconsistency in the interrogatory response and document request response. But, Rowley cannot claim to be unaware of the claim or surprised. Moreover, he had more than a year before the close of discovery to clarify the discrepancy. Accordingly, the court grants First American's motion for summary judgment against William Rowley with respect to the insurance premium remittance claim.

## Defendant's Motion for Partial Summary Judgment

Defendants move for summary judgment on First American's fraudulent transfer claims against Spencer Rowley and William Rowley, First American's successor liability claims against NTAU, and First American's fraudulent concealment claim against Spencer Rowley and NTAU. In response, First American clarified that it is only stating its fraudulent concealment cause of action against William Rowley and National Title. In addition, First American clarified that it is bringing its cause of action for successor liability under the second and fourth exceptions recognized in Utah, not the third exception which is the basis for Defendants' motion.[1]

---

[1] In Utah, successor liability exists if the following four exceptions exist: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchasers; (3) the purchasing corporation is merely a continuation of the selling corporation; and (4) the transaction is entered into fraudulently in order to escape liability for such debts. *Decius v. Action Collection Serv., Inc.*, 2004 UT 484 ¶ 8, 105 P.3d 956, 958-59.

Therefore, the court deems Defendants' motion on the third exception to be moot. Accordingly, the only issue remaining for the court to decide is whether First American can maintain a claim against William and Spencer Rowley for fraudulent transfer.

Defendants seek summary judgment on First American's fraudulent transfer claim against Spencer Rowley and William Rowley because they are premised on the Asset Purchase Agreement between National Title and NTAU, not the individuals. Under Utah law, corporations and limited liability companies are "regarded as . . . legal entit[ies] separate and apart from [their] stockholders." *Lodges at Bear Hollow v. Bear Hollow Restoration, LLC*, 2015 UT App 6, ¶ 13, 344 P.3d 145. A party seeking to impose liability on an officer, director, or shareholder must proffer evidence that the business entity is an "alter ego" of the individual and "pierce" the corporate veil. *Id.*

Defendants argue that First American's fraudulent transfer claims against Spencer and William Rowley fail because the Fraudulent Transfer Act provides no cause of action against individual directors or shareholders of a corporate entity and First American has not brought a claim to pierce the corporate veil. Under Utah law, a transfer may be fraudulent under two scenarios: (1) When a transfer is made with "actual intent to hinder, delay, or defraud any creditor of the debtor;" or (2) If the transfer is made without "receiving reasonably equivalent value in exchange for the transfer" and the debtor intended to incur, or "should have believed that he would incur, debts beyond his ability to pay as they became due." Utah Code Ann. § 25-6-5. The creditor may obtain "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." *Id.* § 25-6-8(1)(a). Furthermore, "the creditor may recover judgment for the value of the asset transferred . . . against" . . . "the first transferee" and "any subsequent transferee other than a good faith transferee who took for value." *Id.* § 25-6-9(2).

In this case, the only "debtor" or "transferee" identified in the Complaint is National Title and NTAU. National Title is the only entity that dealt with First American and NTAU is the only entity that received assets from National Title. None of the remedies provided for in the Fraudulent Transfer Act includes an independent tort action against persons who did not personally transfer or receive assets in a fraudulent transfer. Thus, the Act does not authorize First American to seek relief from the individual directors or shareholders absent a piercing of the corporate veil.

Utah Supreme Court precedent suggests that the Act's remedies are limited to the parties to an alleged fraudulent transfer. *BYU v. Tremco Consultants, Inc.*, 2005 UT 19, ¶ 7, 110 P.3d 678. Here, the undisputed facts demonstrate that Spencer Rowley and William Rowley were not parties to the APA. The transfer was between two separate legal entities. First American has not brought a claim to pierce the corporate veil. Consequently, First American cannot impose individual liability on Spencer and William Rowley for a fraudulent transfer.

First American argues that there is a reasonable inference that National Title used its assets to pay legal fees incurred by William and Spencer Rowley as well as NTAU and although National Title might properly pay a lawyer to defend itself, gratuitously giving its assets to third parties is a fraudulent transfer because National Title receives no benefit from paying fees for the Rowleys and NTAU. However, prior to the summary judgment briefing, First American had made no claim that National Title's payment of attorney fees constitutes a fraudulent transfer. Moreover, as a defendant in this action, National Title is incurring its own legal fees that must be paid, and National Title represents that it has incurred in excess of $98,000 in attorney's fees and costs defending this action and bringing claims on its own behalf. Therefore, the evidence before the court does not establish a fraudulent transfer claim against William and Spencer Rowley in

14

their individual capacities.

## CONCLUSION

Based on the above reasoning, Plaintiff First American Title Insurance Company's Motion for Partial Summary Judgment [Docket No. 93] is GRANTED IN PART AND DENIED IN PART, and Defendants National Title Agency of Utah, William D. Rowley, and Sterling Spencer Rowley's Motion for Partial Summary Judgment [Docket No. 96] is GRANTED IN PART AND MOOT IN PART.

DATED this 19th day of May, 2017.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge